Below is an opinion of the court.

_[signature]_

THOMAS M. RENN
U.S. Bankruptcy Judge

## UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re | Case No.  15-63718-tmr7 |
| RONALD C. LESTER, JR., and ALICE L. LESTER, | |
| Debtors. | |
| CANDACE AMBORN, Trustee, | Adv. Proc. No. 16-6126-tmr |
| Plaintiff, | |
| v. | |
| ANGELA DEE TAYLOR, RONALD C. LESTER, JR., and ALICE L. LESTER, | |
| Defendants. | |
| UNITED STATES TRUSTEE, | Adv. Proc. No. 17-6014-tmr |
| Plaintiff, | |
| v. | MEMORANDUM OPINION[1] |
| RONALD C. LESTER, JR., and ALICE L. LESTER, | |
| Defendants. | |

---

[1] This disposition is specific to these cases and is not intended for publication or to have a controlling effect on other cases.  It may, however, be cited for whatever persuasive value it may have.

Trustee, Candace Amborn, filed her Amended Complaint to avoid the transfer of Debtors' commercial real property located at 8401 Rogue River Highway, in Grants Pass, Oregon (Property), to their daughter Angela Taylor. Trustee argues that the transfer is avoidable pursuant to 11 U.S.C. § 544(b) by application of § 3304 of the Federal Debt Collection Procedure Act (FDCPA).[2] She also seeks a determination under 11 U.S.C. § 541 that the Property is property of the estate. In a separate adversary proceeding, the United States Trustee (UST) seeks to revoke Debtors' discharge pursuant to 11 U.S.C. § 727(d)(1).

Because the operative facts in the two cases overlap and because my conclusions in each impact my analysis in the other, I have combined by rulings in the two cases for purposes of this Memorandum Opinion only. My decision to issue a joint ruling is consistent with the overlapping approach the parties, counsel, and the court have taken throughout the cases, which culminated in a joint trial. Following closing arguments, I took the matters under advisement. I have considered the parties' arguments, reviewed their submissions, and conducted my own research into the issues. For the reasons outlined below, I rule in the Defendants' favor in both cases and will enter appropriate judgments.

Factual and Procedural Background

Except as limited below, the following facts are either stipulated by the parties or were undisputed at trial.

Ms. Lester and her first former spouse purchased the Property in 1974 and used it as a storage facility (15 units). They divorced in 1980, and Ms. Lester was awarded the Property in the divorce. After Ms. Lester remarried and pending the divorce from her second husband in the early 1980's, Ms. Lester transferred title to the Property to her parents "to keep it safe." In 1992 her parents transferred via quit claim deed the Property for "Love and Affection" to Ronald and Alice Lester, who were by then married. Ms. Lester testified at the trial in this case that, since 1981 when Ms. Taylor was born, she intended to give the Property to her daughter as part of her "legacy."

---

[2] Unless otherwise indicated, all subsequent statutory references are to Title 28 of the United States Code (the Federal Debt Collection Procedure Act).

Since 1992 and up through the bankruptcy petition date, the Lesters managed and leased the Property as a storage facility. They lived in California until they moved to Oregon in 2014. While they resided in California, they hired someone to manage the Property for them. The Lesters testified that, due to the poor condition of the facility and problems with the property manager, the Property has never generated much income. They do not rent out the back portion due to excessive mold. The Property also includes a separate mobile home, but it, too, is in poor condition and has not been occupied for many years. At all relevant times, the Property has been free and clear of any encumbrances, aside from periodic liens for relatively small amounts of property tax debt.

On March 5, 2010, Debtors transferred the Property to Ms. Taylor via bargain and sale deed (Transfer). The deed lists a purchase price of $100, but the Lesters' testimony indicates that Ms. Taylor did not pay anything for the Property. All parties agree that the Transfer was intended as a gift to Ms. Taylor. In 2010 the Jackson County Tax Assessor assessed a real market value of $138,600 for the Property.

At the time of the Transfer, the Lesters owed personal income taxes to the Internal Revenue Service (IRS) for tax year 2008 in the amount of $6,578. They paid the balance in full in August 2010. Although they did not make quarterly tax payments for their 2009 taxes, they filed their 2009 returns and paid the total liability before the October 15, 2010, (extended) deadline. As outlined in the IRS's Proof of Claim (POC) #2-1, at the time of petition-filing, the Lesters owed a total of $47,336 in personal income taxes for tax years 2010, 2011, 2012, 2013, and 2014.

Additionally, at the time of the Transfer, the Lesters were delinquent on their payments for the mortgage on their residential real property in Ventura County, California (California Property). They did not make any monthly payments from late 2009 through 2010. The Lesters assert that, during that time, they applied for a modification of their mortgage loan. Mr. Lester testified that, although they had money in a safe deposit box sufficient to bring the mortgage payments current, they ceased making payments at the bank's direction in order to facilitate the

loan modification process.[3]  The bank proceeded with foreclosure, but set over the sale a few times.  The Notice of Default and Election to Sell Under Deed of Trust (Notice of Default) lists an outstanding loan balance of $800,443 and a default of $17,825.97 as of February 1, 2010. Ventura County's assessed value in 2010 was $650,491. Although the Lesters attempted to sell the California Property, they did not receive any offers higher than the amount owed to the bank. They concede that there was no equity in the California Property.  The bank ultimately foreclosed on the California Property in January 2011.

Notwithstanding the Transfer to Ms. Taylor, the Lesters continued to manage the Property and storage facility as they had for the previous 18 years.  After moving to Oregon in 2014, they took over direct management of the Property.  Ms. Lester has done most of the management-related tasks, but she testified that she did not keep an accounting of the income and expenses until after the bankruptcy filing, because the income was usually too low to justify doing so.  She kept the cash rents in a sock drawer and paid the Property's expenses from those funds.  If the rent was insufficient to pay the property taxes and utility bills, which happened frequently, the Lesters paid the difference.  They have not, however, included the Property's expenses as a deduction on their tax returns since the Transfer in 2010.  They assert that they have been acting in the capacity of managers for Ms. Taylor, although the Trustee and UST dispute this contention.

Ms. Taylor currently (and at all relevant times) resides in California.  She has not viewed the Property since the Transfer, nor does she have any involvement with its management or upkeep.  She has not paid anything toward the expenses of the Property.

On April 21, 2015, Mr. Lester first met with attorney Edward Talmadge to discuss filing for bankruptcy relief.  Mr. Talmadge testified that, at that first meeting, Mr. Lester represented

---

[3] Trustee disputes these assertions, pointing out there is no evidence besides Mr. Lester's testimony regarding the amount of funds in the safe deposit box or the hearsay statements of the bank employee.  At trial, I admitted testimony about why the Lesters stopped making their mortgage payments as evidence of their reason for doing so and their understanding of the circumstances surrounding the default.  I did not admit the testimony for the truth of the matter asserted; specifically, that a bank representative advised them to cease making payments.

Case 17-06014-tmr    Doc 75    Filed 02/21/20

that neither he nor his wife had an interest in any real property. Mr. Talmadge first learned about the Property on October 15, 2015, when he received a faxed copy of the bargain and sale deed transferring it to Ms. Taylor.[4] After consulting with outside counsel and researching several statutes under which a trustee might attempt to avoid the Transfer, Mr. Talmadge concluded that, because the Transfer occurred more than 4 years prior, a bankruptcy trustee would not be able to successfully avoid the Transfer. He advised the Lesters accordingly. He also testified that the Lesters were emphatic about the Transfer being a being a "100% transfer" to Ms. Taylor for estate planning purposes; they wanted her to have it and did not intend to retain an interest. Based on the strength of their representations and given how many years had passed since the Transfer, he did not believe the Lesters retained an equitable interest or that the parties expected Ms. Taylor to reconvey it to them in the future. Mr. Talmadge did not ask additional questions about the Property, nor did the Lesters disclose at that time that they continued to manage it.

Nearly five years and eight months after the Transfer, the Lesters filed their bankruptcy petition on November 4, 2015. On their Schedule A, they indicate that they do not have any legal or equitable interest in any real property. On Schedules I and J, they do not list any income or expenses related to the Property. On their Statement of Financial Affairs (SOFA), section 1, they do not list income related to the Property. In section 14, they state that they do not hold or control property owned by another person. In section 18, the only business listed pertains to Mr. Lester's insurance sales. Since the initial bankruptcy filing, they have not amended their documents to reflect the Property or any related income or expenses.

Mr. Talmadge testified that he first learned about the Lesters' management of the Property and its related income and expenses in July 2016 in the context of receiving Trustee's Motion for Turnover; and Order Thereon (Doc. #22 in the Main Case). He later prepared amended schedules and an amended statement of financial affairs to account for the Property.

---

[4] Although Mr. Talmadge originally believed the Lesters sent the fax, they testified that they did not. The parties now think it likely that the fax originated from a third party.

The attorney-client relationship had deteriorated, however, and the Lesters did not sign or file the amended documents.[5]

On December 2, 2016, Trustee filed this adversary proceeding seeking to avoid the Transfer pursuant to 11 U.S.C. § 544(b). She argues that, standing in the shoes of the IRS, which has an allowed claim under 11 U.S.C. § 502, she is entitled to avoid fraudulent transfers under § 3304(a)(1) or (b)(1) of the FDCPA. Trustee also requests a determination that the Property is property of the bankruptcy estate pursuant to 11 U.S.C. § 541, arguing that the Lesters have an equitable interest in the Property and that Ms. Taylor is a "mere nominee." Although Trustee asserted a third claim under 26 U.S.C. §§ 6502(a) and 6901(a)(1)(A), she subsequently withdrew that claim.

On March 7, 2017, the UST filed an adversary proceeding to revoke the Lesters' chapter 7 discharge pursuant to 11 U.S.C. § 727(d)(1), arguing that the Lesters obtained their discharge through fraud. More specifically, the UST asserts that, by not disclosing their interest in the Property, the Lesters concealed property of the estate with the intent to hinder, delay, or defraud creditors (11 U.S.C. § 727(a)(2)). He also argues that the Lesters knowingly and fraudulently made false oaths in their bankruptcy paperwork and at the meeting of creditors (11 U.S.C. § 727(a)(4)).

Jurisdiction

I have jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 1334, 157(b)(1), and 157(b)(2)(A), (H), (J), and (O).

Trustee's Claims

**1. Avoidance of Fraudulent Transfer**

Under 11 U.S.C. § 544(b)(1), "the trustee may avoid any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title . . . ." Section 3304(a)(1) provides in part:

---

[5] On January 5, 2017, attorney Keith Boyd substituted in as counsel for Debtors in the main bankruptcy case. Although he remains attorney of record in that case, the Lesters and Ms. Taylor have represented themselves for the duration of these adversary proceedings.

**Debt arising before transfer**.--Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States *which arises before the transfer is made* or the obligation is incurred if—

    (1)(A) the debtor makes the transfer or incurs the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and
    (B) the debtor is insolvent at that time or the debtor becomes insolvent as a result of the transfer or obligation[.]

(italics added).

    Section 3304(b)(1) provides in relevant part:

**Transfers without regard to date of judgment**.--(1) Except as provided in section 3307, a transfer made or obligation incurred by a debtor is fraudulent as to a debt to the United States, *whether such debt arises before or after the transfer is made or the obligation is incurred*, if the debtor makes the transfer or incurs the obligation—

    (A) with actual intent to hinder, delay, or defraud a creditor; *or*
    (B) without receiving a reasonably equivalent value in exchange for the transfer or obligation if the debtor—

        (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; *or*
        (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

(italics added).

    As I previously ruled in the context of Trustee's Motion for Summary Judgment, Trustee has the right under 11 U.S.C. § 544(b)(1) to assert claims under § 3304. Summary of Proceedings & Minute Order (Doc. #66 in Case No. 16-6126); s*ee also In re CVAH, Inc*., 570 B.R. 816, 836 (Bankr. D. Idaho 2017) ("if IRS could avoid a fraudulent transfer outside of bankruptcy [under the FDCPA], § 544(b)(1) enables the bankruptcy trustee, acting on behalf of IRS, to also do so"). There is no dispute that the Transfer of the Property to Ms. Taylor constitutes a "transfer" under 11 U.S.C. §§ 101(54) and 544(b), as well as under § 3301(6). The parties agree that, for purposes of 11 U.S.C. § 544(b)(1), the IRS has an allowed, unsecured claim under 11 U.S.C. § 502 for $47,336 (POC #2-1). The parties also agree that the IRS claim is "a debt to the United States" as those terms are used in § 3001 et seq. There is no issue regarding the applicable 6-year statute of limitations under § 3306(b).

    a.  *Debt Arises Before Transfer - § 3304(a)*

In order to prevail under § 3304(a)(1), Trustee must prove that (1) the debt to the IRS arose before the Transfer; (2) the Lesters did not receive reasonably equivalent value in exchange; and (3) the Lesters were insolvent at the time of the Transfer or became insolvent as a result. *See, e.g., In re Phillips and Hornsby Litigation*, 306 F. Supp. 2d 631, 635 (M.D. La. 2004). As to the first element, Trustee argues it is irrelevant that, after the Transfer, the Lesters paid in full the IRS 2008 tax debt owing at the time of the Transfer. She asserts it is sufficient that the Lesters owed money to the IRS on both the Transfer date and the bankruptcy petition date, regardless of the fact that the debts owed on the date of each event are for different tax years. I disagree.

Section 3304 includes two subsections entitled, "(a) Debt arising before the transfer" and "(b) Transfers without regard to date of judgment." Notably, subsection (a) does not have an intent requirement. Instead, "[f]raudulent intent or lack of reasonableness is supposedly presumed when the transferror's [sic] debt arose prior to the time he transferred his assets." *Phillips and Hornsby Litigation*, 306 F. Supp. 2d at 636. By contrast, "claims brought under subsection (b) have either an intent requirement or a 'reasonableness' requirement." *Id*. This distinction makes sense: "a creditor must be prejudiced by a transfer in order to challenge it, and a creditor whose claim is paid off is simply not prejudiced by the transfer." *Unsecured Creditors' Comm. v. Banque Paribas (In re Heartland Chemicals, Inc.*), 103 B.R. 1012, 1016 (Bankr. C.D. Ill. 1989) (internal citations omitted). Although the claim at issue in *Heartland Chemicals* is based on 11 U.S.C. § 544(b) and not § 3304, the rationale still holds. If fraudulent intent is presumed as to debts owed at the time of a transfer, that presumption fails when the transferor subsequently pays the debt in full, with the outcome being that the claimant must proceed under a different theory.

In this case, the Lesters owed taxes for 2008 and 2009 at the time of the Transfer in March 2010. They paid off those debts later in 2010. Even if I found a presumption of fraudulent intent as to the 2008 and 2009 IRS debt on the Transfer date, the Lesters effectively rebut that presumption by subsequently paying the debt in full. The fact that, on the petition date, they owed the IRS for tax years 2010 through 2014 does not change the analysis.

To recover under § 3304(a), Trustee must establish that there is "a debt to the United States which *arises before* the transfer . . . ." § 3304(a) (emphasis added). As the bankruptcy court held in *CVAH*, the trustee satisfies the "arises before" requirement of § 3304(a) if the tax debt owed to the IRS on the date of the transfer is "identical in nature," if not amount, to the debt outlined in the IRS's proof of claim. 570 B.R. at 841 (citing *In re Acequia, Inc.,* 34 F.3d 800, 808 (9th Cir. 1994)); s*ee also Sergeant v. OneWestBank, FSB (In re Walter)*, 462 B.R. 698, 708 (Bankr. N.D. Iowa 2011) (absent allegation that debt comprising IRS's proof of claim was owing at time of transfer, trustee cannot proceed under § 3304(a)).

In this case, there is no dispute that the taxes owed for 2011, 2012, 2013, and 2014 arose after the Transfer. As to the 2010 tax debt, it was not owing in March 2010. "[T]ax liabilities, though unassessed, are deemed obligations due and owing at the close of the taxable year" – i.e. on December 31, 2010. *Edelson v. C.I.R.*, 829 F.2d 828, 834 (9th Cir. 1987). Where the debt outlined in IRS POC #2-1 pertains to different tax years than were owed on the Transfer date, they are not identical in nature and, thus, did not arise before the Transfer.

In support of her position, Trustee cites *In re Allou Distributors, Inc*. for the proposition that "a triggering creditor must be the *same creditor* on both the Transfer Date and the Petition Date, but need not hold the *same claim* at these two essential points in time." 392 B.R. 24, 34 (Bankr. E.D.N.Y. 2008) (emphasis in original). The court in *Allou Distributors* addressed the question of whether the trustee had standing to proceed under 11 U.S.C. § 544(b) and, by extension, New York fraudulent conveyance law[6] where the debtor paid off the contract-based debts owed to "the triggering creditors" on the transfer date, but became indebted to those creditors again prior to filing bankruptcy. *Id*. at 31. The *Allou Distributors* court did not analyze the creditor's claims through the § 3304 framework of the FDCPA. Nor do § 544(b) or New York fraudulent conveyance law include a timing distinction such as we find in the FDCPA regarding "debt arising before transfer" and "transfers without regard to date of judgment." For

---

[6] *See* N.Y. Debt. & Cred. Law §§ 273-276 (McKinney).

these reasons, I find *Allou Distributors* distinguishable and not relevant to the analysis in this case.

Trustee does not cite, nor could I find, any caselaw applying § 3304 and treating the debt-timing provisions in the manner proposed by Trustee. Therefore, for the above reasons, I hold that Trustee cannot establish that the debt to the IRS arose before the Transfer, and Trustee is not entitled to relief under § 3304(a).[7]

### b. *Transfers Without Regard to Date of Judgment - § 3304(b)*

There is no dispute that the debt to the IRS falls within the "arises before or after the transfer is made" language of § 3304(b). The question is whether Trustee has met her burden to prove the remaining elements: the Lesters made the Transfer "with actual intent to hinder, delay, or defraud a creditor" (§ 3304(b)(1)(A)); or, in the alternative, they made the Transfer "without receiving a reasonably equivalent value in exchange" (§ 3304(b)(1)(B)) *and* they "intended to incur, or believed or reasonably should have believed [they] would incur, debts beyond [their] ability to pay as they became due" (§ 3304(b)(1)(B)(ii)).[8]

### c. *Actual Intent to Hinder, Delay, or Defraud Creditors – § 3304(b)(1)(A)*

The FDCPA provides that "[i]n determining actual intent under paragraph (1), consideration may be given, *among other factors*, to whether—

> (A) the transfer was to an insider;
> (B) the debtor retained possession or control of the property transferred after the transfer;
> (C) the transfer or obligation was disclosed or concealed;
> (D) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> (E) the transfer was of substantially all the debtor's assets;
> (F) the debtor absconded;

---

[7] Where Trustee fails to prove this element of her § 3304(a) claim, I need not analyze whether she established the remaining two elements: that the Lesters did not receive reasonably equivalent value in exchange; and the Lesters were insolvent at the time of the transfer or became insolvent as a result. Even so, my discussion about these two elements in Trustee's § 3304(b)(1) claim, discussed below, would apply with equal force in the context of § 3304(a)(1)(A).

[8] As noted above, § 3304(b)(1)(B)(i) includes the additional, disjunctive element that the debtor "was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction." Trustee does not allege that this element applies, nor do I have reason to believe that it does.

Case 17-06014-tmr    Doc 75    Filed 02/21/20

    (G) the debtor removed or concealed assets;

    (H) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred . . . ;

    (I)  the debtor was insolvent or became insolvent shortly after the transfer was made . . . ;

    (J)  the transfer occurred shortly before or shortly after a substantial debt was incurred; and

    (K) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Section 3304(b)(2) (emphasis added).

These factors closely align with the circumstantial "badges of fraud" in fraudulent transfer cases.[9] "Actual intent to defraud need not be proven in order to establish that a fraudulent conveyance occurred. Indicia or circumstantial evidence, if proven by clear and convincing evidence, can be sufficient to establish intent to defraud." *U.S. v. Schippers*, 982 F. Supp. 2d 948, 965 (S.D. Iowa 2013) (internal citations omitted). *See also U.S. v. Crocker*, No. CIV-02-803-PHX-ROS, 2005 WL 8161488, at *5 (D. Ariz. Sept. 23, 2005) ("Courts have traditionally held that actual fraud can be established only by clear and convincing evidence.") As with other actions involving badges of fraud, "once a trustee established indicia of fraud in an action under section 548(a)(1) [of the Bankruptcy Code], the burden shifts to the transferee to prove some 'legitimate supervening purpose' for the transfers at issue." *Acequia*, 34 F.3d at 806 (discussing the relative burdens in a fraud case brought under § 548(a)(1) of the Bankruptcy Code).

Transfer to an insider - § 3304(b)(2)(A). The transferee, Angela Taylor, is the Debtors' daughter and an "insider" as the term is defined in § 3301(5). This favors a finding of fraudulent intent.

Retained possession or control - § 3304(b)(2)(B). The Lesters retained possession and control of the Property after the Transfer and continue to manage it just as they did before the Transfer. This favors a finding of fraudulent intent.

---

[9] *See, e.g., In re Acequia*, 34 F.3d at 806 ("[a]mong the more common circumstantial indicia of fraudulent intent at the time of the transfer are: (1) actual or threatened litigation against the debtor; (2) a purported transfer of all or substantially all of the debtor's property; (3) insolvency or other unmanageable indebtedness on the part of the debtor; (4) a special relationship between the debtor and the transferee; and, after the transfer, (5) retention by the debtor of the property involved in the putative transfer.") (emphasis omitted).

<u>Transfer disclosed or concealed - § 3304(b)(2)(C)</u>.  Trustee argues that the Lesters'
failure to disclose the Property or the Transfer in their bankruptcy documents indicates an intent
to conceal both.  This argument fails to account for the fact that section 10 of the SOFA only
requires disclosure of transfers that occurred within the two years immediately preceding
commencement of the case and, thus, does not require disclosure of the Transfer.  Further, the
Lesters discussed the Property with their attorney.  Following his counsel, they did not believe
they had a beneficial or equitable interest in the Property.  Debtors in good faith are entitled to
rely on the advice of their attorneys.  *See First Beverly Bank v. Adeeb (In re Adeeb)*, 787 F.2d
1339, 1343 (9th Cir. 1986).  As such, I do not find that their failure to disclose such an interest
on Schedule A (regarding real property) supports a finding of intent to defraud creditors.  By
extension, where they viewed their management of the Property as simply management without
an ownership interest, I do not place much significance in their failure to disclose the related
income and expenses on Schedules I and J.  While they should have listed the Property in section
14 of the SOFA (regarding "Property held for another person"), their failure to do so does not
weigh heavily in my consideration of the disclosures in their bankruptcy paperwork.  On balance,
I believe this factor is either neutral or does not support a finding of actual intent.

<u>Threat of suit - § 3304(b)(2)(D)</u>.  Trustee argues that the threatened foreclosure sale of
the Lesters' California Property satisfies this element.  Because the elements under § 3304(b)(2)
are aimed at ascertaining the subjective intent of the transferor, the circumstances surrounding
the foreclosure sale are relevant in this case.  The Lesters argue that, although they were aware of
the original and extended foreclosure sale dates, they had applied for a loan modification, had
ceased making mortgage payments at the bank's direction (to facilitate the modification process),
and had set aside funds in a safe deposit box sufficient to cure the arrearage.  They argue that,
although the bank proceeded with the loan modification and foreclosure processes
simultaneously, they believed they would be given an opportunity to cure the default before any
foreclosure sale occurred.

Aside from the Lesters' testimony, the Notice of Default (Exhibit 102), and the Notice of
Trustee's Sale of Real Property (Exhibit 103), I do not have any evidence of the circumstances

surrounding the foreclosure or loan modification application. Even so, I find the Lesters' testimony credible as to their belief about the status of the loan modification, their stated reason for not making payments on the loan, and their belief they would be given an opportunity to cure the payment default prior to the foreclosure sale. The Notice of Default lists a default of $17,826 as of February 1, 2010, one month before the Transfer. After considering the Lesters' testimony and reviewing their bank statements and self-prepared income and expense statements for January, February, and March of 2010, I find that they had the ability to cure the default, at least as of the Transfer date. Where they were able to cure, the possible future foreclosure was not as much of a "threat."

Perhaps more importantly, the threatened legal action was irrelevant to the Oregon Property at issue. There is no evidence that (1) the Lesters' interest in the Oregon Property was threatened by the pending foreclosure of the California Property or (2) the Lesters thought that it was. With backgrounds in management, finance, and insurance, the Lesters are relatively sophisticated in financial matters, as Trustee concedes. I see no basis to find that they viewed the Transfer as a way to protect the Property from the mortgage holder on the California Property. Therefore, for the above reasons, I find that the threatened foreclosure sale does not weigh in favor of a finding of fraudulent intent.

Trustee also suggests that the Lesters transferred the Property to protect it from potential IRS tax liens.[10] Given that they also put funds in a safe deposit box (discussed below) to protect them from IRS seizure, Trustee's allegations have merit. As outlined above, at the time of the Transfer, the Lesters owed IRS income taxes for 2008 and 2009. Because they filed an extension for 2009, the taxes owed for that year were not due until October 2010. The 2008 taxes were owing at the time of the Transfer, but because the Lesters filed the returns for that year on extension (by October 2009), the debt was not long past due. Further, the amount owing was relatively small - $6,579. On balance, I find that the potential IRS tax lien is either neutral as to a finding of fraudulent intent, or, if it weighs in favor of such a finding, it carries little weight.

---

[10] The parties agree that, at all relevant times, the IRS had not filed a notice of its tax lien and, therefore, did not have a perfected lien.

Case 17-06014-tmr    Doc 75    Filed 02/21/20

Transfer of substantially all assets - § 3304(b)(2)(E). Trustee argues that this element is satisfied because the Property was the Lesters' only *unencumbered* asset. Whether the transferred asset was encumbered is not the standard. The question is whether "the transfer was of substantially all the debtor's assets." § 3304(b)(2)(E). Even by Trustee's calculations, the value of the Property (between $99,000 and $138,600) at the time of the Transfer was far less than the value of the Lesters' California Property (between $650,000 and $800,000). That said, for the reasons outlined in subsection d below, I do not have sufficient evidence to determine the value of the Property on the Transfer date and find it unlikely that the Property was worth as much as Trustee suggests. When weighed against the California Property and the Lesters' personal property and liquid assets, I find that the Transfer was not of "substantially all" their assets. This weighs against a finding of fraudulent intent.

Debtor absconded - § 3304(b)(2)(F). There is no allegation that the Lesters absconded. This weighs against a finding of fraudulent intent.

Removed or concealed assets - § 3304(b)(2)(G). The Lesters acknowledge that, in the months leading up to and after the Transfer, they kept funds in a safe deposit box to prevent the IRS from seizing the funds. Although doing so is not illegal, it weighs in favor of a finding of fraudulent intent.

Value of the consideration - § 3304(b)(2)(H). The parties agree that the Transfer was a gift to Ms. Taylor for little or no consideration. This weighs in favor of a finding of fraudulent intent.

Insolvency - § 3304(b)(2)(I). Under the FDCPA, debtors are presumed insolvent if they are "generally not paying debts as they become due." § 3302(b). "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation." § 3302(a). The evidence presented at trial demonstrates that the Lesters' liabilities exceeded their assets at the time of, or as a result of, the Transfer. Therefore, they were insolvent at the time of the Transfer, a factor that weighs in favor of a finding that the Transfer was fraudulent.

Transfer of property shortly before or after incurrence of substantial debt - § 3304(b)(2)(j). Trustee argues that the Transfer took place shortly after the Lesters incurred

substantial mortgage arrears. Again, the Notice of Default lists a mortgage arrearage of $17,826 approximately one month before the Transfer. Given the $800,443 total owing on the mortgage and the Lesters' other debts, the $17,826 arrearage is not a "substantial" debt, as that term is intended under the statute. Moreover, the mortgage debt itself was not incurred "shortly before or shortly after" the Transfer, as outlined in § 3304(b)(2)(J). Although the Lesters defaulted shortly before the Transfer, for the reasons I outlined above, I find they voluntarily defaulted on the payments in the belief it would help their loan modification application, they had the ability to cure the arrears at the time of the Transfer, and they intended to do so if the loan modification was not approved. Therefore, this factor weighs against a finding of fraudulent intent.

Essential assets of the business - § 3304(b)(2)(K). This factor does not apply in this case.

Additional factors. By its plain language, § 3304(b)(2) states that the court may consider other factors when determining whether a transferor intended to hinder, delay, or defraud creditors. In this case, the Lesters state that they transferred the Property to Ms. Taylor, because they had always intended to give it to her. Ms. Lester testified that she first knew she would give the Property to her daughter when she (Ms. Lester) became pregnant in the early 1980s. She asserts that she and her first husband structured their divorce with the expectation that Ms. Lester would ultimately give the Property to Ms. Taylor. Both Lesters describe the Property as being Ms. Taylor's "legacy" and testify that they have always maintained it with the expectation that they would give it to her. In Mr. Talmadge's testimony about his initial discussions with the Lesters about the Transfer, he confirms the substance and sincerity of the Lesters' claim that the Transfer was a gift and was intended as such at the time. As to the timing of the Transfer, the Lesters testified that, given Ms. Lester's history of cancer and the then-recent death of several of her friends (who were first diagnosed with cancer at a similar time), they were worried about Ms. Lester's health and thought it an appropriate time to give the Property to Ms. Taylor.

I find the Lesters' testimony credible as to their intent when they transferred the Property. As such, and when considering all the other § 3304(b)(2) factors, I cannot find that Trustee has met her burden to prove that the Lesters transferred the Property with the actual intent to hinder, delay, or defraud their creditors. Trustee cannot, therefore, proceed under § 3304(b)(1)(A).

d. *Constructive fraud under § 3304(b)(1)(B).*

Even if Trustee does not establish that the Lesters committed *actual fraud* under
§ 3304(b)(1)(A), she may show *constructive fraud* under § 3304(b)(1)(B). *U.S. v. Schippers,* 982
F. Supp. 2d at 953-54. In contrast to the actual intent requirement of § 3304(b)(1)(A), "the
gravamen of § 3304(b)(1)(B) is the making of the transfer without receiving a reasonably
equivalent value in exchange when the transfer would reasonably be expected to cause the debtor
to incur debts beyond his ability to pay them as they became due." *Id.* at 965. To show
constructive fraud, Trustee must prove, by a preponderance of the evidence, that she satisfies all
required elements of the statute. *U.S. v. Crocker*, 2005 WL 8161488, at *5.

Reasonably equivalent value. Trustee argues that, because Ms. Taylor paid little or
nothing for the Property, the Lesters necessarily did not receive a reasonably equivalent value in
exchange. Trustee concedes she has the burden of proof on this element, but in closing
argument, she asserted that there ought to be a presumption that a parcel of real property has at
least *some* appreciable value.

Section 3303(a) of the FDCPA provides that "[v]alue is given for a transfer or an
obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent
debt is secured or satisfied . . . ." Section 3303(b) defines "reasonably equivalent value," but that
definition applies only to foreclosure sales.[11] "For help construing the term in other
circumstances, courts have turned to cases interpreting the Bankruptcy Code's fraudulent transfer
provision." *U.S. v. Crocker*, 2005 WL 8161488, at *7; *see also U.S. v. Goforth*, 465 F.3d 730,
736 n.7 (6th Cir. 2006) (applying caselaw analyzing 11 U.S.C. § 548 to the question of whether a
transferee-spouse provided reasonably equivalent value under the FDCPA when she made
payments to her spouse for household expenses).

Section 548(a)(1)(B) of the Bankruptcy Code permits the trustee to avoid "constructive
fraudulent transfers" which are defined, in part, as ones for which the debtor receives "less than a

---

[11] Section 3303(b) reads: "For the purposes of sections 3304 and 3307, a person gives reasonably
equivalent value if the person acquires an interest of the debtor in an asset pursuant to a regularly
conducted, noncollusive foreclosure sale or execution of a power of sale for the acquisition or
disposition of such interest upon default under a mortgage, deed of trust, or security agreement."

reasonably equivalent value." The Ninth Circuit instructs that the reasonably equivalent value determination is "directed at what the debtor surrendered and what the debtor received irrespective of what any third party may have gained or lost." *Wyle v. C.H. Rider & Family (In re United Energy Corp.)*, 944 F.2d 589, 597 (9th Cir. 1991) (internal citation omitted). "The time at which 'reasonably equivalent value' is determined is the time of the transaction." *U.S. v. Crocker,* 2005 WL 8161488, at *8 (internal citation omitted). But as the court in *CVAH, Inc.*, notes:

> A bankruptcy trustee must always prove the other, substantive elements of the claim, such as the debtors' insolvency, lack of reasonably equivalent value for the transfer, and others. Practically speaking, the burden of proving these elements would seem more onerous, and success less likely, the further back in time the transfer occurred from the bankruptcy petition date. In other words, the likelihood a trustee may be successful in avoiding transfers occurring seven, eight, ten or more years before the bankruptcy filing will certainly be diminished by the facts in many cases.

570 B.R. at 838.

In this case, the Transfer occurred nearly six years before the Lesters filed their bankruptcy case and over nine years before trial. Trustee did not employ a broker or other real estate professional to determine either the present value or the value at the time of the Transfer. She has not personally inspected the Property. Instead, Trustee bases her case on the following: the $138,600 real market value (RMV) indicated on the Jackson County Tax Assessment for 2010 (Trustee's Exhibit 117); the March 27, 2018, email from broker Susan Jaeger of Windermere Real Estate, estimating a 200**9** value of "approximately $99,000" (Lesters' Exhibit I); and the argument that there should be a presumption that the Property has some appreciable value.

As discussed at trial, the County's Tax Assessment has limited evidentiary significance. No one disputes that $138,600 is the RMV upon which the County assessed taxes for 2010. Where, however, Trustee offers the Exhibit to prove that the Property was worth $138,600 in 2010, the evidence is inadmissible hearsay to which there does not appear to be an exception. But even if I admitted the Exhibit to prove value, there is no foundation upon which to treat it as

Case 17-06014-tmr    Doc 75    Filed 02/21/20

a valuation offered by an expert with personal knowledge of the Property. As such, it does not further the value analysis.

The broker's email suffers from similar problems. It provides, in pertinent part:

> Hi Ron,
>
> You asked me for an opinion of the 2009 value of the property located at 8401 Rogue River Highway, Rogue River. The property consists of 3.83 acres with only about ½ acre usable, a 1973 mobile home and storage buildings. I showed the property back around that timeframe, and my opinion of the value was approximately $99,000 instead of the $249,000 being asked. The property listing expired without sale, after being on the market for 248 days, which indicates that the asking price was too high. In fact, the buildings had mold in them, and I would not enter the buildings, and the mobile home was not financeable even at that time. I'm considering in that value that the mobile home would have to be removed, and the buildings torn down and disposed of.
>
> Let me know if you need any further information.
>
> Susan Jaeger

Ms. Jaeger's statement does not suffer from a hearsay problem because it was originally offered by the Lesters and, thus, is more in the nature of a party admission. But, under the circumstances, it has limited evidentiary weight. Aside from the signature line in the email stating "Susan Jaeger and Marian Szewc[;] Principal Brokers, Licensed in the State of Oregon" and listing a street address in Rogue River, neither party laid a foundation to establish Ms. Jaeger as an expert witness competent to testify about commercial property values in Rogue River. Although she "showed" the property "back around" 2009, this does not give me enough information to assess the extent of her personal knowledge of the Property in 2009, let alone at the time of the Transfer in March 2010. Where she states that she "would not enter the buildings," she presumably has no personal knowledge of their interiors. She speaks of the buildings as having "mold in them," but we do not know how it impacted her assessment of value. She asserts that "the mobile home was not financeable." Absent clarification and a basis for ascertaining her expertise to make such a determination, I cannot meaningfully assess whether it is credible or accurate.

Further, although Ms. Jaeger states, "I'm considering in that [$99,000] value that the mobile home would have to be removed, [sic] and the buildings torn down and disposed of," I

have insufficient information to determine whether this is, in fact, necessary and, if it is, what her cost estimate was and how it impacted her valuation. Did she mean that the Property could be sold for $99,000 only after the Lesters removed the buildings? Or did she discount the value to $99,000 with the assumption that the buyer would have to remove the buildings? For these reasons, I find the email unhelpful in determining the value of the Property at the time of the Transfer. At best, it simply corroborates facts that are not in dispute: only a limited segment of the Property is usable, the structures have mold in them, and the structures may need to be torn down and removed.

Mr. and Ms. Lester are both familiar with the Property and its condition. Ms. Lester testified regarding the extensive mold. She stated that the mobile home is not habitable, and that the back portion of the storage facility cannot be rented out because of mold. Historically, the storage facility has not generated enough income to pay the minimal expenses (property taxes and the electric bill). Ms. Lester stated that the Property is a "conditional use property" and must always be used as a storage facility. The Lesters did not provide additional evidence to support these claims, but Trustee did not dispute them. Mr. Lester testified that, over the years, they have only done "emergency repairs," the most notable being the installation of a security light. He said he believed the Property was "not worth a hill of beans." Under Fed. R. Evid. 701, the Lesters, as owners of the Property, may testify regarding its condition and value. But where they are not experts in commercial property valuations, their opinions of value have limited weight. As such, and for the reasons outlined above, I do not have a sufficient basis to determine the value of the Property on the date of the Transfer.

That said, the Lesters provided credible, undisputed testimony regarding the condition of the Property and the limitations on its use. With the limited usability of the acreage, the conditional use restrictions placed on the Property, the extensive mold damage in all the structures, and the likelihood that some or all of the structures would need to be removed, I find that it is perhaps more likely than not that the considerable costs necessary to market and sell the property meet or exceed its value. Stated another way, Trustee has not shown by a

preponderance of the evidence that the Lesters transferred property worth more than the little or nothing Ms. Taylor paid for it.

Trustee does not cite, nor could I find, any authority to support her argument that there is or should be a presumption that parcels of real property have some value. More importantly, the argument runs contrary to the burden of proof under § 3304(b)(1). Trustee cannot forgo her burden to investigate the Property and present evidence of its value in favor of a vague – and sometimes erroneous – presumption that real properties have value. "Reasonably equivalent value is a fact intensive determination that typically requires testing through the discovery process." *Walter*, 462 B.R. at 709 (internal citation omitted). Because Trustee has not established this element of her claim, she cannot prevail under § 3304(b)(1)(B).

### 2. Property of the Estate – Equitable Ownership

Under 11 U.S.C. § 541, property of the estate includes all legal or equitable interests of the debtor in property. "Whether property belongs to the debtor, and therefore the bankruptcy estate, is determined by state law." *U.S. v. Lawrence*, 189 F.3d 838, 845 (9th Cir. 1999) (internal citation omitted). Again, Trustee carries the burden of proof. Citing caselaw from the Eleventh Circuit and the Bankruptcy Courts for the Middle District of Florida and Central District of California, Trustee argues that, under the "nominee" theory of ownership, Ms. Taylor is the Lesters' mere nominee and that the Lesters retain an equitable interest in the Property such that it is property of the bankruptcy estate, notwithstanding the fact that Ms. Taylor holds legal title. Under this theory, the court must "attempt[] to discern whether a [transferor] has engaged in a sort of legal fiction . . . by placing legal title to the property in the hands of another while, in actuality, retaining all or some of the benefits of being the true owner." *In re Steffen*, 464 B.R. 450, 453 (Bankr. M.D. Fla. 2012), *aff'd*, No. 8:13-CV-1700-T-27, 2014 WL 11428827 (M.D. Fla. Mar. 13, 2014), *aff'd*, 611 F. App'x 677 (11th Cir. 2015). Trustee requests that I consider the following factors in determining whether Ms. Taylor is a nominee:

  (a) No consideration or inadequate consideration paid by the nominee;
  (b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;
  (c) Close relationship between transferor and the nominee;

      (d) Retention of possession by the transferor;
      (e) Continued enjoyment by the transferor of benefits of the transferred
          property; and
      (f) Failure to record conveyance.

*In re Swenson*, 381 B.R. 272, 301 (Bankr. E.D. Cal. 2008).

      Trustee does not cite any binding Ninth Circuit caselaw or other authority outlining whether and how the nominee theory of ownership applies in Oregon. But even if I were to apply the theory in the manner suggested by Trustee, she does not prevail on her claim. The § 3304(b)(2) factors for determining intent to defraud parallel the nominee theory factors. Indeed, both are aimed at ferreting out a "legal fiction." As such, much of my analysis outlined in section 1(c) and (d) above applies in this context.

      Ms. Taylor is the Lesters' daughter, she paid nothing in consideration for the Transfer, and the Lesters retain possession and control of the Property. But the remaining nominee theory factors do not support Trustee's position. The Lesters recorded the bargain and sale deed within days of executing it. Given the amount of time that has lapsed, nothing suggests that they expect her to reconvey the Property to them. For the reasons I previously outlined, the 2008 tax liability and the Notice of Default are not relevant to the analysis. Unlike the debtors in *Swenson*, the Lesters claimed no tax deductions for their payment of the Property's expenses after the Transfer. They retain possession and control as managers, but unlike the transferors in *Swenson*, they do not reside at the Property or benefit from its use. Given its condition, its questionable value, and the ongoing expense and work required to manage it, the circumstances do not support a finding that they accrue any enjoyment or benefit from it. Instead, the facts and the Lesters' credible testimony support the conclusion that they gifted the Property to Ms. Taylor in 2010 and have since been managing it for her benefit.

      Trustee makes much of the fact that the Lesters pay "out of their own pockets" expenses of the Property that exceed the amount of the rents. Trustee's argument, however, overlooks a common, practical reality that I must account for in determining the parties' intent: parents sometimes provide financial assistance to their adult children without an expectation of anything in return and without an intent to obtain an ownership interest in the child's property. In this case, the record reflects that Ms. Taylor has limited financial resources, has not been required to

file tax returns for several years, and has experienced several personal setbacks with which the Lesters have attempted to assist. Under the circumstances, and where Ms. Taylor resides in California, it's more appropriate to categorize the Lesters' willingness to manage the Property and periodically pay some of its expenses as another form of gift to her.

When considering all the evidence and the factors designed to ascertain the parties' intent, I find that Ms. Taylor is not a "mere nominee" and that the Transfer is not part of a "legal fiction" designed to obscure the fact that they truly own the Property. The Lesters transferred their legal and equitable interest to Ms. Taylor in 2010, and it is not property of the estate.

### UST's Claim for Revocation of Discharge under § 727(d)(1)

On March 17, 2016, the court entered the Chapter 7 Order re: Discharge of Debtors. Pursuant to 11 U.S.C. § 727(d)(1) and, by extension, § 727(a)(2) and (4)(A), the UST requests revocation of the Lesters' discharge.

> Those objecting to discharge bear the burden of proving by a preponderance of the evidence that the debtor's discharge should be denied. In keeping with the 'fresh start' purposes behind the Bankruptcy Code, courts should construe § 727 liberally in favor of debtors and strictly against parties objecting to discharge. This does not alter the burden on the objector, but rather means that actual, rather than constructive, intent is required on the part of the debtor.

*In re Retz*, 606 F.3d 1189, 1196 (9th Cir. 2010) (internal citations omitted). To prevail on a claim under 11 U.S.C. § 727(a)(4), the UST must show, "by a preponderance of the evidence that: (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently." *Id*. at 1197.

The UST argues, first, that the Lesters, with the intent to hinder, delay, or defraud creditors, concealed their interest in the Property and, second, that they knowingly and fraudulently made false oaths or accounts when they stated in their paperwork and at the meeting of creditors that they do not have an interest in the Property. As outlined above, the Lesters gifted their interest in the Property to Ms. Taylor in 2010. Having discussed the matter with counsel prior to filing and relying on his advice, they did not believe they had a beneficial or equitable interest in the Property. Where they did not have an interest in the Property or a reason

to believe that they did, they did not "conceal" property within the meaning of 11 U.S.C. § 727(a)(2). As such, the UST's claim under this subsection fails.

The claim under 11 U.S.C. § 727(a)(4)(A) fails for a similar reason: the Lesters had no interest in the Property and their oaths and accounts stating such were correct. That said, because they hold and control the Property for Ms. Taylor, they should have listed it in section 14 of the SOFA (regarding "Property held for another person"). Their representation that, "no," they are not holding such property was a false statement. This false statement, however, was not done with fraudulent intent for the reasons outlined in section 1(c) above. Therefore, consistent with the standard outlined in *Retz*, I find that the UST has not met his burden to prove by a preponderance of the evidence that the Lesters' discharge should be denied under 11 U.S.C. § 727(a) or that, by extension, it should be revoked pursuant to 11 U.S.C. § 727(d).

<u>Conclusion</u>

For the above reasons, Trustee and the UST have not met their respective burdens of proof and their claims must be dismissed. I will enter judgments to that effect in each adversary proceeding. This Memorandum Opinion constitutes my findings of facts and conclusions of law under Fed. R. Bankr. P. 7052.

###